HELANE L. MORRISON (State Bar No. 127752)
JAMES A. HOWELL (State Bar No. 92721)
CHRISTOPHER C. COOKE (State Bar No. 142342)
PATRICK THOMAS MURPHY (NY State Bar No. 2685717)

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 1100
San Francisco, California 94104
Telephone:  (415) 705-2500
Facsimile:  (415) 705-2501

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>        Plaintiff,<br><br>    vs.<br><br>REZA MIKAILLI, GARY F. PADO, and UNIFY CORPORATION,<br><br>        Defendants. | Civil Action No.  02-2426 RS<br><br>COMPLAINT<br>(E-Filed) |

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

## SUMMARY OF THE ACTION

1.      From at least September 1999 through May 2000, Unify Corporation ("Unify" or the "Company"), a Sacramento, California management software company, reported false financial results to its shareholders, the Commission and the public.  These false financial reports were the direct result of the fraudulent efforts of Reza Mikailli, the former President and Chief Executive Officer ("CEO") of Unify, and Gary F. Pado, Unify's Chief Financial Officer ("CFO").

2.      Mikailli and Pado orchestrated the fraudulent scheme by essentially causing Unify to "buy" its own sales revenue.  This was accomplished by structuring transactions in a manner where Unify provided funds to its customers so that the customers could use those funds to buy Unify

product.  Mikailli and Pado also created false revenue by entering into concealed side agreements with customers that granted the customer a right of cancellation, the right not to pay at all, or extended payment terms.  These transactions possessed no net economic benefit to the Company or its shareholders, were not properly recognizable as revenue, and artificially inflated the value of Unify's stock.

3.     As a consequence of the actions of Mikailli and Pado, Unify issued press releases and filed quarterly reports with the Commission, on Form 10-Q, that contained materially false and misleading information concerning Unify's revenue and income for the quarters ended July 31, 1999, October 31, 1999, and January 31, 2000.  As a further consequence of the actions of Mikailli and Pado, the Company also issued a press release announcing materially false revenue for the quarter and the fiscal year ended April 30, 2000.

4.     The Commission seeks to enjoin all defendants from future violations of the federal securities laws, and bar Mikailli and Pado from serving as directors or officers of companies reporting to the Commission.  In addition, the Commission seeks to obtain disgorgement of all benefits received by Mikailli from his violations of the securities laws and to obtain civil monetary penalties against Mikailli and Pado for their violations.

## JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT

5.     The Commission brings this action pursuant to Sections 21(d), 21(e), and 21A of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d), 78u(e), and 78u-1(a)].  This Court has jurisdiction over this action pursuant to Sections 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(e) and 78aa].

6.     Mikailli, Pado, and Unify made use of the means and instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, in connection with the acts, practices, and courses of business and transactions alleged herein.

7.     This district is an appropriate venue for this action under Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Certain of the transactions, acts, practices and courses of business constituting the violations alleged herein occurred within the Northern District of California.

8.      Assignment to the San Jose Division is appropriate pursuant to Civil Local Rule 3-2(e) because a substantial part of the events that gave rise to the claims occurred in Santa Clara County, California.

## DEFENDANTS

9.      **Reza Mikailli**, age 49, resides in Saratoga, California.  He was the President, CEO, and a Director of Unify from November 1994 until November 10, 2000, when he was terminated by Unify.  As President and CEO of Unify, Mikailli had overall responsibility for the day-to-day operations of the company and accurate reporting of the company's operations to its board of directors, the Commission and the public.  As a director of Unify, Mikailli had a responsibility, along with the other directors, to set policies and goals for the company and oversee the management of the company on behalf of its shareholders.

10.      **Gary F. Pado**, age 38, resides in Sacramento, California.  He was the CFO of Unify from November 1998 until he resigned on November 10, 2000.  Pado also served as Unify's Acting President and CEO from June 6, 2000 until his resignation.  Prior to becoming CFO, Pado served as Unify's Corporate Controller, from April 1998 to November 1998, and Accounting Director, from August 1997 to April 1998.    Pado is a Certified Public Accountant licensed by the State of California.  As CFO of Unify, Pado had overall responsibility for the company's financial books and records, financial reporting and fiscal management. During the period he served as Acting President and CEO of Unify, Pado had overall responsibility for the day-to-day operations of the company and accurate reporting of the company's operations to its board of directors, the Commission and the public.

11.      **Unify Corporation** is a Delaware corporation, with its corporate and operational headquarters in Sacramento, California.  During fiscal year 2000, Unify maintained its corporate headquarters in San Jose, California.  It develops and markets traditional and internet-based storage and management software.  Unify's common stock is registered with the Commission pursuant to Section 12(g) of the Exchange Act, and was traded on the NASDAQ National Market from 1996 until July 31, 2000, when trading was suspended.  Unify's stock was delisted by

NASDAQ on October 23, 2000, and the stock is currently quoted by various broker dealers in the OTC market.

## ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

**A.  Unify Was Required To Accurately Report Its Financial Condition And Results.**

12. In order to sell its common stock and other securities to members of the public and maintain public trading of its securities, Unify was required to comply with statutes, rules and regulations designed to ensure that the Company's financial information was accurately recorded and disclosed to the investing public.  Under these statutes, rules and regulations, Unify had a duty to, among other things:  (a) make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflected its transactions and dispositions of assets; (b) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles and to maintain accountability for assets; (c) file with the Commission an annual report on the appropriate form (known as a "Form 10-K") for each fiscal year including a financial statement including a balance sheet and statements of income and cash flows prepared in conformity with generally accepted accounting principles and certified by an independent public accountant; and (d) file with the Commission quarterly reports on the appropriate form (known as a "Form 10-Q") for each of the first three quarters of each fiscal year including financial statements that disclose its financial condition and results of business operations for each three-month period.

13. Under generally accepted accounting principles, Commission rules and regulations, and Unify's publicly stated accounting policies, Unify's sales revenues and income were recorded and reported for specific reporting periods – that is, by fiscal quarter and by fiscal year. Unify could recognize revenues from the sale of software during a particular reporting period only if there was persuasive evidence of a sale to a customer, delivery of the software had occurred, the price for the software was fixed or determinable, collectibility was reasonably assured, and Unify had substantially performed all of its obligations to the customers.

**B. Defendants Mikailli And Pado Carried Out A Fraudulent Scheme To Misrepresent Unify's Financial Results**

14.     During Unify's fiscal year 2000 beginning on May 1, 1999, and ended on April 30, 2000, Mikailli and Pado approved and issued quarterly announcements of Unify's revenue and earnings.  Unify also filed with the Commission quarterly reports on Form 10-Q for the first three quarters of the fiscal year containing the same revenue and earnings information.  The Form 10-Qs were approved by Mikailli, and signed by Pado.  For the purpose of registering the sale of stock to the public, Mikailli also signed a registration statement for the Company's common stock on Form S-3 that was filed with the Commission on March 14, 2000. This registration statement incorporated by reference each of the Company's Form 10-Q filings for the prior three quarters.

15.     As CEO and CFO, Mikailli and Pado had frequent communications with investors and market analysts (persons or companies who followed Unify's stock and published opinions concerning the Company's past performance and expected future performance). They closely followed analysts' announcements of revenue and earnings expectations.  Beginning in May of 1999, Mikailli and Pado communicated to these analysts and investors that Unify was in the process of transitioning from a traditional database software company into an emerging e-commerce company with internet-based products.  In conjunction with these communications, Mikailli and Pado provided guidance and created expectations with the analysts and investors that quarterly sales would continually increase.

16.     During each quarter of fiscal year 2000, Mikailli and Pado closely monitored the general progress of Unify's sales and assessed the likelihood that particular sales would close. They obtained this information through reports, meetings, and communications with Unify employees and potential customers.  In the last two weeks of each quarter, Mikailli and Pado were in continual contact with each other to closely monitor potential sales and compare these potential sales with the expectations of the market analysts and investors.

17.     When demand for Unify's products was insufficient to meet the expectations communicated to the analysts, Mikailli and Pado resorted to creating fictitious sales revenue to meet

these expectations.  To increase the reported revenue for each quarter of Unify's fiscal year 2000, Mikailli and Pado negotiated and executed transactions that were either contingent or reciprocal.

18.     A "contingent sale" refers to a sales contract in which the customer does not have a binding obligation to pay for the goods purchased.  A contingent sale may arise where a customer is informally assured that it does not have to pay for goods it has purportedly purchased, where the customer may postpone payment, or where a customer has the right to cancel a sales contract before any payment is made.  Under generally accepted accounting principles, contingent sales may not be recognized as revenue because the price of the software is not fixed and determinable and the collectibility of the sales price is not probable.

19.     A "reciprocal transaction" refers to a sales contract in which a customer agrees to purchase software from Unify on the condition that Unify provide the customer with the funds to make that purchase.  Unify did this either by purchasing the same amount of a customer's product or services as the customer was purchasing from Unify (also known as a "barter"), or by paying a customer, through an investment or separate agreement, an amount sufficient to fund the customer's purchase from Unify (also known as a "round-tripping").  The effect of such transactions was that Unify would not receive any net economic benefit because it was essentially using its own funds to purchase revenue.  No assets were derived from such activity.  Under generally accepted accounting principles, Unify could not recognize revenue on such reciprocal transactions with customers because Unify's revenue was contingent on Unify's performance of its obligation to the customer.

20.     Mikailli and Pado created contingent transactions by executing a contract while simultaneously granting the customer the right not to pay, to cancel the contract, or to extend payment beyond the payment terms specified in the contract.  Mikailli and Pado agreed to grant contingencies to customers because these customers were unwilling or unable to enter into binding contracts with Unify absent such concessions.  As a result of the contingencies, the customers had no binding obligation to pay Unify.  Both Mikailli and Pado knew that contingent transactions lacked a binding obligation of payment, resulted in the improper recognition of revenue, and violated both generally accepted accounting principles and Unify's revenue recognition policy.

21.     Mikailli and Pado created reciprocal transactions by persuading customers to purchase Unify product in exchange for Unify's promise to provide something of substantially equivalent economic value to offset the purchase price.  Reciprocal transactions were structured in three separate forms:  an outright barter transaction where Unify purchased the same amount of product from a customer as the customer was purchasing from Unify; funded transactions where Unify made an investment in a customer in order to provide the customer with the funds it needed to purchase Unify's product; or funded transactions where Unify would provide funds for a customer's product purchase by executing a separate agreement to pay the customer for software development work that was never completed.  In providing funds to a customer or purchasing an identical amount of product from a customer in exchange for a purchase of its product, Unify was engaging in an offsetting swap that failed to create any net economic benefit to the Company.  Both Mikailli and Pado knew, or were reckless in not knowing, that reciprocal transactions did not conform with generally accepted accounting principles and resulted in the improper recognition of revenue.

22.     Mikailli and Pado were unable to maintain their fraudulent revenue recognition scheme beyond fiscal year 2000.  During the second half of fiscal year 2000, Mikailli and Pado were actively attempting to sell Unify, and had communicated with several companies about a potential acquisition.  Mikailli had frequent discussions with and provided documentation to two larger companies.  In or around the first two weeks of May, the first company informed Mikailli that it was not interested in acquiring Unify.  On or about June 2, 2000, Mikailli was informed by the second company that it was not interested in acquiring Unify.  On June 6, 2000, Unify issued a press release stating that Mikailli had suffered a heart attack and was taking a leave of absence.  On or around June 20, 2000, Mikailli informed Unify's Human Resource Manager that he had sold all of his Unify stock.

23.     Unify's management, including Mikailli and Pado, reported to the company's board of directors.  A committee of the board of directors, the Audit Committee, had specific responsibility to monitor Unify's financial reporting and the Company's relationship with independent certified public accountants that performed audits and reviews of the Company's financial statements ("independent auditors").  On July 5, 2000, the Unify Audit Committee

1   authorized an independent investigation of Unify's revenue recognition practices.  The Audit

2   Committee contacted Unify's independent auditors regarding the investigation, and the auditors

3   suspended their ongoing year-end audit.  On July 31, 2000, Unify issued a press release stating that

4   the Company's board of directors had become aware of improper accounting practices and improper

5   revenue recognition.  The press release also stated that the Company would delay filing its annual

6   report or Form 10-K, and would be filing amended Form 10-Qs for each of the first three quarters of

7   fiscal year 2000.  It also announced that Mikailli and Pado were being placed on administrative leave

8   during the investigation, and cautioned that its financial results for the first quarter of fiscal year 2001

9   would not meet market analysts' expectations with respect to revenue and net earnings.  NASDAQ

10  suspended trading in Unify common stock prior to the opening of trading on July 31, 2000, and

11  delisted the stock on October 23, 2000.

12          24.     On November 17, 2000, Unify announced that Mikailli had been terminated,

13  Pado had resigned, and a new President and CEO had been appointed by the board of directors.

14          25.     On December 20, 2000, Unify issued a press release announcing restated

15  financial results for the first three quarters, and revised results for the fourth quarter and the fiscal

16  year ended April 30, 2000.  On the same day the Company filed its amended Form 10-Qs and its

17  delayed  Form 10-K for fiscal year 2000.  As these amended 10-Qs and the 10-K set forth, Unify's

18  quarterly revenues were overstated from 58% to 150 %.  The difference in the financial results

19  reported by Unify and the actual results achieved is set forth in the chart below:

20

21                      **RESTATED UNIFY FINANCIAL RESULTS BY QUARTER**

| Quarter Ending | NET REVENUE (millions) | | | NET INCOME (LOSS) (millions) | | |
|---|---|---|---|---|---|---|
| | Originally Reported/ Announced | As Restated | Percentage Overstated | Originally Reported/ Announced | As Restated | Percentage Overstated |
| 7/31/99 | $ 8.7 | $ 5.4 | 61.1% | $ 1.7 | $(2.4) | 170.8% |
| 10/31/99 | $ 9.2 | $ 5.8 | 58.6% | $ 2.1 | $(1.3) | 261.5% |
| 1/31/00 | $ 10.1 | $ 5.3 | 90.6% | $ 2.8 | $ (.8) | 450.0% |
| 4/30/00 | $ 11.5 | $ 4.6 | 150.0% | $ 8.6 | $(3.2) | 368.8% |
| **TOTAL** | **$ 39.5** | **$ 21.1** | **87.2%** | **$ 15.3** | **$(7.7)** | **298.7%** |

**B.      Unify Reports False Revenue For The First Quarter Ended July 31, 1999.**

26.      On September 10, 1999, Unify filed with the Commission its Form 10-Q for the quarter ended July 31, 1999.  The Company had previously issued a press release on August 17, 1999 detailing the same quarterly results and highlighting the "continued momentum of e-commerce" sales.  The Company's reported total revenue and net income for the period were $8.7 million and $1.7 million, respectively.  Unify's restated financial results for this period decreased total revenue to $5.4 million and decreased income to a net loss of $2.4 million due to improper accounting practices.  The original 10-Q overstated revenue by over 61% and net income by over 170%.

*The Open SA Contingent Sale*

27.      In order to meet earnings expectations for first quarter of fiscal year 2000, on July 30, 1999, Mikailli and Pado negotiated and executed a contract with Open SA, a Panamanian company.  At that time Open SA had an existing agreement with Unify on which it still owed payment in the amount of $400,000.  Despite the outstanding obligation, Mikailli convinced Open SA to commit to the new contract and additional payment obligations of $1.15 million.  The CEO of Open SA informed Mikailli and Pado that Open SA lacked the financial ability to commit to any additional payment obligations.  Mikailli orally informed the Open SA CEO that he should agree to the additional payment obligations because he would not have to worry about making any actual payments.

28.      Prior to July 30, 1999, both Mikailli and Pado had been informed that Unify's independent auditors would not allow Unify to recognize new revenue from Open SA as long as Open SA had not paid off its prior $400,000 payment obligation.  Accordingly, Mikailli wired $400,000 of his personal funds to Open SA that Open SA then forwarded as payment to Unify for its prior obligation.  Pursuant to the terms of the new $1.15 million payment obligations, Open SA was required to pay Unify on September 15, 1999.  In order to hide the fact that Open SA was not going to make any payment, Pado recorded revenue based upon a "deposit in transit."

29.      As both Mikailli and Pado knew, because of the oral contingency granting Open SA the right not to pay and the funding by Mikailli of Open SA's payment to Unify in the

1   amount of $400,000, the recording of the new $1.15 million Open SA contract as revenue violated

2   generally accepted accounting principles and Unify's revenue recognition policy.  Accordingly, in

3   including the Open SA revenue in the first quarter 10-Q and the press release, Mikailli and Pado

4   knowingly made false and misleading statements regarding the revenue of Unify.

5                    *The Databyte, Inc. Contingent Sale*

6            30.     On July 30, 1999, Mikailli and Pado had Unify record $250,000 in revenue

7   from a contract with Databyte, Inc.  This revenue was required in order to meet the expectations of

8   analysts for the quarter.  As Mikailli and Pado knew, the Databyte contract was a contingent contract

9   not properly recognizable as revenue under generally accepted accounting principles.

10           31.     As Mikailli and Pado knew, Databyte was unwilling to enter into a contract to

11  purchase product from Unify until it had reached a separate agreement to sell Unify product to an

12  unrelated third party.  In order to persuade Databyte to sign the deal, Pado provided two separate side

13  letter agreements to Databyte.  The first letter agreed that Unify would partially fund Databyte's

14  payment to Unify by providing a $100,000 commission payment.  The second letter expressly

15  granted Databyte the right to cancel the purchase from Unify in the event it did not reach a deal with

16  the unrelated third party.  Mikailli and Pado approved the terms of each side letter agreement, and

17  Pado signed both.

18           32.     As Mikailli and Pado knew, because the side letter agreements granted

19  Databyte the contingent right not to pay under the contract and Unify had partially funded the

20  purchase through a $100,000 commission payment, the recording of the Databyte revenue violated

21  generally accepted accounting principles and Unify's revenue recognition policy.  Accordingly, by

22  including the Databyte revenue in the quarterly financial results reported in the 10-Q and the press

23  release, Mikailli and Pado knowingly made false and misleading statements regarding the revenue of

24  Unify.

25  **C.      Unify Reports False Revenue For The Second Quarter Ended October 31, 1999.**

26           33.     On December 15, 1999, Unify filed with the Commission its Form 10-Q for

27  the quarter ended October 31, 1999.  The Company had previously issued a press release on

28  November 16, 1999 detailing the same quarterly results and again highlighting "increased momentum

1   with e-commerce" sales.  The Form 10-Q and the press release reported revenue of $9.2 million and

2   net income of $2.1 million.  Unify's restated financial results for this period decreased total revenue

3   to $5.8 million and income to a net loss of $1.3 million.  Due to the fraud orchestrated by Mikailli

4   and Pado, the original 10-Q overstated revenue by over 58% and net income by over 260%.

5                    *The Arango Software Reciprocal Transaction*

6                    34.     On October 31, 1999, the last day of the second quarter of fiscal year 2000,

7   Unify recognized $500,000 in revenue from Arango Software ("Arango"), a Panamanian company.

8   Mikailli and Pado structured this transaction as a reciprocal transaction in violation of generally

9   accepted accounting principles.  In its restatement, Unify eliminated all of this revenue.

10                   35.     During September 1999, Mikailli directly negotiated with Arango, including

11  by traveling to Panama.  In order to persuade Arango to purchase Unify's product, and thereby

12  generate revenue for Unify, Mikailli proposed to Arango that Unify would fund Arango's purchase of

13  Unify product by providing funds through a purported investment.  A deal proposal forwarded to

14  Arango, and approved by Mikailli and Pado, explicitly stated that Arango would buy Unify's product

15  but that "the actual cost is actually financed through the investment."  Arango accepted the proposal

16  and bought Unify product using the investment funds from Unify.  The payments were scheduled to

17  ensure that Unify first paid Arango for the investment and then Arango paid the same amount back to

18  Unify.

19                   36.     Mikailli and Pado were also aware that Unify's independent auditors might

20  question the deal.  Accordingly, they structured the deal so that Unify's investment would occur in

21  the following quarter (but before Arango had to pay for the Unify product).  By placing the sale and

22  the investment in different reporting periods, Mikailli and Pado were able to obscure the fact that the

23  investment was funding the product purchase.

24                   37.     Unify issued a press release on December 1, 1999 that quoted Mikailli

25  highlighting Arango's decision to purchase Unify software and the "tremendous momentum" it

26  generated for Unify.  The press release failed to mention the offsetting investment in Arango by

27  Unify.

28

38.     As Mikailli and Pado knew, because of the offsetting investment by Unify that funded the product purchase by Arango, the recording of the Arango revenue violated generally accepted accounting principles.  Accordingly, by including the Arango revenue in the quarterly financial results reported in the 10-Q and the press release, Mikailli and Pado knowingly made false and misleading statements regarding the revenue of Unify.

### *The Evergreen Internet, Inc. Reciprocal Transaction*

39.     On October 31, 2000, the last day of the second quarter, Unify recognized $500,000 in second quarter revenue from a sale of product to Evergreen Internet, Inc ("Evergreen"). In order to meet the expectation of their quarterly revenue numbers, Mikailli and Pado fraudulently created this deal as a reciprocal transaction in violation of generally accepted accounting principles. Unify's restatement eliminated all $500,000 of this revenue.

40.     In or around August 1999, Mikailli was in discussions with Evergreen regarding a potential strategic relationship between the two companies.  Mikailli informed the CEO of Evergreen that in order for such a relationship to exist, Evergreen would have to generate some revenue for Unify by purchasing some of its product.  Evergreen's CEO informed Mikailli that Evergreen did not want to spend any of its funds to buy Unify's product.  Accordingly, Pado simultaneously executed a licensing contract where Evergreen agreed to purchase $500,000 of Unify product and a "Funded Development Agreement" pursuant to which Unify would pay Evergreen $545,000 for software development work.  Pado also executed a letter to Evergreen which explicitly stated that Evergreen's obligation to make payments to Unify for Unify product were "contingent upon payment by Unify of the $545,000 set forth in the Funded Development Agreement."

41.     As Mikailli and Pado knew, because of the funding of Evergreen's purchase of Unify product through the Funded Development Agreement, the recording of the Evergreen revenue violated generally accepted accounting principles.  Accordingly, by including the Evergreen revenue in the quarterly financial results reported in the Form 10-Q and the press release, Mikailli and Pado knowingly made false and misleading statements regarding the revenue of Unify.

### *The Ichatterbox, Inc. Reciprocal Transaction*

42.     At the close of the second quarter, Unify recognized $100,000 in revenue from a license agreement with Ichatterbox, Inc. ("Ichatterbox"). Mikailli and Pado fraudulently created this transaction as a reciprocal transaction in order to meet quarterly revenue expectations. Unify's restatement eliminated all $100,000 of the Ichatterbox revenue.

43.     In or around July 1999, Mikailli was in discussions with the CEO of Ichatterbox about the possibility of joining the board of directors of Ichatterbox. Mikailli told the Ichatterbox CEO that he could only join the board if Ichatterbox purchased some of Unify's product. Ichatterbox was a small start-up with little cash and had no business purpose for utilizing Unify's software. Mikailli told the Ichatterbox CEO that it would not cost Ichatterbox anything to purchase Unify's software because Unify would fund the purchase.

44.     On or around October 15, 1999, Pado executed a contract with Ichatterbox, wherein Ichatterbox agreed to buy $100,000 of Unify product. On or around the same date, Mikailli paid Ichatterbox $300,000, and instructed the Ichatterbox CEO that $100,000 was to be used to buy Unify's product and the remainder was to be for an investment in Ichatterbox. In accordance with these instructions, Ichatterbox used the funds from Mikailli to purchase $100,000 of Unify product. At Pado's instruction, Unify reimbursed Mikailli $300,000.

45.     As Mikailli and Pado knew, because Unify funded the product purchase by Ichatterbox through a reciprocal offsetting investment, the recording of the Ichatterbox revenue violated generally accepted accounting principles. As a result, by including the Ichatterbox revenue in the quarterly financial results reported in the 10-Q and the press release, Mikailli and Pado knowingly made false and misleading statements regarding the revenue of Unify.

### *The Triple G, Inc. Contingent Sale*

46.     At the close of the second quarter, Unify recognized $1.5 million in second quarter revenue from Triple G, Inc. ("Triple G"), a Canadian company. In order to meet the analysts' expectations of their quarterly revenue numbers, Mikailli and Pado fraudulently created this deal as a contingent transaction in violation of generally accepted accounting principles. Unify's restatement eliminated $1.2 million of this revenue.

47.     At the time of the fraud, Triple G was an existing Unify customer that had made a significant commitment to using Unify software in its business.  In July 1999, Mikailli was in negotiations with the CEO of Triple G.  Mikailli informed the Triple G CEO that Triple G would have to commit to buying an additional $1.5 million in software from Unify or would lose the right to use Unify software in the future.  The Triple G CEO informed Mikailli that his company lacked the financial ability to make such a commitment.  As a result, Mikailli proposed that Triple G make a partial payment with shares of its stock, along with the right to pay cash in the future by repurchasing its stock via a buy-back right.

48.     As Mikailli and Pado knew, Triple G's payment with stock, along with its buy-back right, could potentially disable Unify from recognizing revenue.  Accordingly, they consulted with Unify's independent auditors prior to executing the transaction.  The auditors informed them that they could do the deal as long as the stock buy-back right did not extend beyond 12 months.  However, Triple G informed Mikailli and Pado that they required the stock buy-back right to extend for 24 months.  Accordingly, Pado executed a side letter agreement stating that Triple G could repurchase one-half of the stock for a period of 24 months.  In order to ensure the recognition of the revenue, Mikailli and Pado hid the side letter from Unify's auditors.  After the fraud was uncovered, Pado told one of Unify's auditors that "we hid [the side letter] from you so we could get our numbers."

49.     As Mikailli and Pado knew, because of the side letter agreement extending the term of Triple G's buy-back right beyond 12 months, the recording of the Triple G revenue violated generally accepted accounting principles and Unify's revenue recognition policy.  Accordingly, by including the Triple G revenue in the quarterly financial results reported in the 10-Q and the press release, Mikailli and Pado knowingly made false and misleading statements regarding the revenue of Unify.

**C.     Unify Reports False Revenue For The Third Quarter Ended January 31, 2000**

50.     On March 14, 2000 Unify filed with the Commission its Form 10-Q for the quarter ended January 31, 2000.  The Company had previously issued a press release detailing the same quarterly results to the public and highlighting "accelerating revenue from e-commerce

solutions." The revenue in the 10-Q and the press release was reported as $10.1 million and net income of $2.8 million. In its December 20, 2000 restatement, Unify decreased total revenue to $5.3 million and income to a net loss of $0.8 million for the third quarter ended January 31, 2000. Due to the fraud orchestrated by Mikailli and Pado, the original 10-Q overstated quarterly revenue by over 90% and net income by over 450%.

### *The Actuate Reciprocal Transaction*

51.     On January 31, 2000, the last day of the third quarter, Unify recognized $2.25 million in revenue from Actuate Corporation ("Actuate"), a company based in South San Francisco, California. In order to meet its quarterly revenue expectations, Mikailli and Pado fraudulently created this deal as a reciprocal barter transaction in violation of generally accepted accounting principles. Unify's restatement eliminated the entire amount of this transaction.

52.     In December 1999, Mikailli approached the CEO of Actuate and proposed a deal in which Unify and Actuate would buy product from each other. From the outset, Mikailli proposed that the two deals would be equal in dollar amount, and therefore would offset each other. In order to hide the offsetting nature of the deals from the quarterly review of Unify's auditors, Mikailli also required each deal to originate in a different quarter.

53.     On January 31, 2000, the last day of Unify's third quarter, Pado executed contracts in which Actuate agreed to pay Unify a total of $2.25 million for products and services. Mikailli, Pado, the CEO of Actuate, and the CFO of Actuate, agreed that Actuate was only purchasing Unify's product because Unify was agreeing to purchase the same dollar amount of product from Actuate. In order to guarantee that Unify would purchase product from Actuate in the next quarter, on January 31, 2000, Unify provided Actuate with a check for $1 million post-dated to Unify's next quarter. Actuate used the funds from Unify to pay for the purported purchase of Unify product.

54.     On March 8, 2000, Unify issued a press release that quoted Mikailli highlighting Actuate's decision to purchase Unify software. The press release failed to mention the offsetting purchase of Actuate's product by Unify.

55.     As Mikailli and Pado knew, because the offsetting product purchases produced no net economic benefit to Unify, the recording of the Actuate revenue violated generally accepted accounting principles.  Accordingly, by including the Actuate revenue in the quarterly financial results reported in the 10-Q and the press release, Mikailli and Pado knowingly made false and misleading statements regarding the revenue of Unify.

### *The First Arsin Corporation Reciprocal Transaction*

56.     At the close of the third quarter, Unify recognized $500,000 in revenue from Arsin Corporation ("Arsin"), a company in Santa Clara, California.  In order to meet its quarterly revenue expectations, Mikailli and Pado created this fraudulent reciprocal transaction.  Unify's restatement eliminated $450,000 of this revenue.

57.     Arsin had previously been retained by Unify to do software development work for $50,000.  Mikailli, who sat on Arsin's board of directors, persuaded the CEO of Arsin to purchase Unify's product by telling him that it would not cost Arsin anything because Unify would fund the payment.  As a result, on or around January 24, 2000, Pado simultaneously executed a software license contract where Arsin agreed to buy $500,000 of Unify product, and an amendment to the Funded Development Agreement pursuant to which Unify agreed to pay Arsin an additional $450,000.  Arsin paid Unify $500,000 under the agreement.  However, Mikailli and Pado were informed by Arsin's CEO that Arsin lacked the funds to clear the check.  As a result, Mikailli and Pado had Unify refrain from depositing Arsin's check until Arsin had received funds from Unify under the Funded Development Agreement.

58.     As Mikailli and Pado knew, because Unify funded the Arsin purchase of Unify product through payments under the Funded Development Agreement, the recording of the Arsin revenue violated generally accepted accounting principles.  Accordingly, by including the Arsin revenue in the quarterly financial results reported in the 10-Q and the press release, Mikailli and Pado knowingly made false and misleading statements regarding the revenue of Unify.

### *The Colorado Property Investors Contingent Sale*

59.     Unify recognized $150,000 in third quarter revenue from Colorado Property Investors ("CPI").  In order to meet targeted revenue expectations for the quarter, Mikailli and Pado

1    created this deal as a fraudulent contingent transaction.  Unify's restatement eliminated all of this

2    revenue.

3              60.     On January 31, 2000, the last day of the quarter, Pado sent an e-mail to the

4    CEO of CPI stating that "it is the end of my quarter today and I am interested in maximizing Unify's

5    potential" and offered contract terms as long as the deal could be closed that day.  After CPI's CEO

6    responded by voicemail and expressed reluctance to sign an agreement on such short notice, Pado

7    sent another e-mail, which was also forwarded to Mikailli, offering to pay for the CPI's CEO to visit

8    Unify, and offering "the ability to cancel the contract after you visit."  This contingency persuaded

9    CPI to sign an agreement for the purchase of $150,000 of Unify product.  However, the actual

10   contract was not executed until February 2, 2000, after Unify's third quarter books had been closed.

11   Nonetheless, Mikailli and Pado had Unify recognize this revenue as third quarter revenue.

12             61.     As Mikailli and Pado knew, because Pado granted CPI a right of cancellation,

13   the recording of the CPI revenue violated generally accepted accounting principles and Unify's

14   revenue recognition policy.  Accordingly, by including the CPI revenue in the quarterly financial

15   results reported in the 10-Q and the press release, Mikailli and Pado knowingly made false and

16   misleading statements regarding the revenue of Unify.

17                         *The Plurify Software Reciprocal Transaction*

18             62.     Unify recognized $200,000 in third quarter revenue from Plurify Software, a

19   Brazilian company.  In order to meet their revenue expectations for the third quarter, Mikailli and

20   Pado created this revenue through a fraudulent reciprocal transaction.  Unify's restatement eliminated

21   all $200,000 of this revenue.

22             63.     Prior to fiscal year 2000, Plurify had entered into a distributorship agreement

23   with Unify.  Beginning in September 1999, Mikailli directly negotiated with Plurify in an attempt to

24   increase Plurify's payment obligations to Unify under this distributorship agreement.  Plurify,

25   through its President, repeatedly informed Mikailli and Pado that it lacked the financial ability to

26   commit to additional payment obligations because of the deteriorating economic situation in Brazil.

27   In order to persuade Plurify, Mikailli and Pado threatened Plurify's President with canceling the

28   existing distributorship agreement.  Plurify agreed to the additional $200,000 in payment terms based

COMPLAINT                                              17
SEC v. Mikailli, et al.

upon a simultaneous Funded Development Agreement in which Unify agreed to pay $200,000 to Plurify. Pado drafted and signed the Funded Development Agreement, and acknowledged in an e-mail to Plurify that he "tried to make it look very official." Pado also provided a post-dated letter stating that Unify had accepted the software development work. In addition to getting paid for development work it never performed, Plurify's President stated in an e-mail sent to Pado that Plurify agreed to the additional payment obligations because he had been persuaded by Mikailli that "it will show for Unify sales an additional commitment of 200k that will help the stocks."

64.     As Mikailli and Pado knew, because Unify funded the purchase of its product through payments under the Funded Development Agreement, the recording of $200,000 of the Plurify revenue violated generally accepted accounting principles. Accordingly, by including the Plurify revenue in the quarterly financial results reported in the 10-Q and the press release, Mikailli and Pado knowingly made false and misleading statements regarding the revenue of Unify.

**C.      Unify Announces False Revenue For The Fourth Quarter Ended April 30, 2000**

65.     On May 23, 2000, Unify issued a press release announcing the results of its fourth quarter and fiscal year ended April 30, 2000, and highlighting again "increased revenue and momentum from Unify e-wave commerce solutions." This press release announced fourth quarter revenue and net income of $11.5 million and $8.6 million, respectively. On December 20, 2000, Unify finally filed its Form 10-K that corrected the originally announced results by decreasing revenue to $4.6 million and income to a net loss of $3.2 million. Due to the fraud orchestrated by Mikailli and Pado, the press release overstated quarterly revenue by 150% and income by 368%.

*The Second Arsin Corporation Reciprocal Transaction*

66.     Unify recognized fourth quarter revenue in the amount of $500,000 on a second licensing deal with Arsin. In order to meet their quarterly revenue expectations, Mikailli and Pado created this revenue through a fraudulent reciprocal transaction. Unify's restatement eliminated all of this revenue.

67.     On April 29, 2000, Pado signed an agreement with Arsin whereby Arsin purchased the right to incorporate Unify's product into a product Arsin hoped to develop. Prior to this transaction, Arsin had been involved only in consulting, and not in producing or selling its own

product.  The agreement required Arsin to pay Unify $500,000 the same day the agreement was

executed, and Arsin provided Unify with a check for the full amount.  However, Arsin's CEO had an

oral agreement with Mikailli and Pado that Unify would not deposit the check until Arsin obtained

sufficient funds for it to clear.  Despite this agreement, a member of Unify's accounting staff

deposited the check, which bounced due to insufficient funds.  In order to clear the check, Pado

executed a wire transfer to Arsin in the amount of $500,000.  Pado wrote notes on the wire transfer

receipt stating that the funds wired to Arsin were to be used to clear Arsin's bounced check.  After

the wire transfer, Mikailli proposed to Arsin's CEO that Arsin keep the money and consider it an

investment by Unify.  However, no documentation of the investment or transfer of shares ever

occurred.

68.     As Mikailli and Pado knew, because Unify funded the purchase of its product

by Arsin through a wire transfer, the recording of the Arsin revenue violated generally accepted

accounting principles.  Accordingly, by including the Arsin revenue in the quarterly financial results

reported in the 10-Q and the press release, Mikailli and Pado knowingly made false and misleading

statements regarding the revenue of Unify.

### *The Fujisaki Contingent Transaction*

69.     Unify recognized fourth quarter revenue in the amount of $1.3 million from a

sale of Unify product to Fujisaki, a Japanese company.  In order to meet their quarterly revenue

expectations, Mikailli and Pado created this revenue through a fraudulent contingent transaction.

Unify's restatement eliminated all of this revenue.

70.     In late December 1999, Mikailli and Pado traveled to Japan to negotiate the

acquisition by Unify of a subsidiary of Fujisaki.  In these negotiations, Mikailli informed Fujisaki

that in order for Unify to acquire the subsidiary, Fujisaki would have to create revenue for Unify by

purchasing Unify product.  Fujisaki would not purchase Unify product unless Unify provided the

funds for it to do so and a written guarantee that Fujisaki had no obligation to purchase Unify product

unless Unify paid Fujisaki for the acquisition of the subsidiary.  Accordingly, Mikailli and Pado

agreed to inflate the proposed acquisition price of the subsidiary by $1.3 million in return for

Fujisaki's agreement to purchase $1.3 million of Unify product.  In addition, on or around January

31, 2000, Mikailli signed a side letter agreement stating that the purchase of Unify product by Fujisaki would be "cancelled" if the acquisition of the subsidiary was not completed.

71.     Despite the side letter agreement in January 2000, Unify did not recognize the revenue at that time because Fujisaki refused to pay for the product purchase until Unify provided the funds to do so.  In order to be able to recognize the revenue in the fourth quarter, Mikailli and Pado had Unify provide the funds to Fujisaki by making a down payment on the intended acquisition of the subsidiary in the amount of $1.5 million.  Of this amount, $500,000 was paid directly to Fujisaki, and the remaining $1 million was placed in escrow pending the completion of the acquisition.  Only then did Fujisaki agree to pay Unify the $1.3 million for Unify product.

72.     As Mikailli and Pado knew, because the side letter agreement granted Fujisaki a right of cancellation and Unify funded the product purchase, the recording of the Fujisaki revenue violated generally accepted accounting principles and Unify's revenue recognition policy. Accordingly, by including the Fujisaki revenue in the quarterly financial results reported in the 10-Q and the press release, Mikailli and Pado knowingly made false and misleading statements regarding the revenue of Unify.

### The WillNet Reciprocal Transaction

73.     Unify recognized $300,000 in fourth quarter revenue from WillNet, a Japanese company.   In order to meet their quarterly revenue expectations, Mikailli and Pado created this revenue through a fraudulent reciprocal transaction.  Unify's restatement eliminated all of this revenue.

74.     Mikailli and Pado had planned to obtain $300,000 in revenue from WillNet in order to meet their quarterly revenue expectations.  The President of Unify Japan informed Pado and Mikailli that WillNet would only agree to purchase Unify product if it was part of a swap transaction resulting in no net loss of cash to WillNet.  Accordingly, on or around April 28, 2000, Pado drafted and signed a Funded Development Agreement backdated to September 1999, which provided payment from Unify to WillNet in the amount of $300,000 for software development work to be completed on April 28, 2000.  WillNet never performed any software development work.

75.     As Mikailli and Pado knew, because Unify funded WillNet's purchase through payments under the Funded Development Agreement, the recording of the WillNet revenue violated generally accepted accounting principles.  Accordingly, by including the WillNet revenue in the quarterly financial results reported in the 10-Q and the press release Mikailli and Pado knowingly made false and misleading statements regarding the revenue of Unify.

### *The False Recording Of Service Revenue*

76.     At the close of the quarter, on or around April 28, 2000, Mikailli and Pado realized that Unify was going to fall short of its revenue expectations.  In order to ensure that the Company met the expectations, Mikailli and Pado instructed Unify's Director of Accounting to make a journal entry recognizing service revenue.  The Director of Accounting objected to Pado that it was improper to recognize revenue that did not exist.  Nonetheless, due to pressure from Mikailli and Pado, the Director of Accounting made an unsupported journal entry recognizing revenue in the amount of $200,000.

77.     As Mikailli and Pado knew that recording revenue that did not exist violated generally accepted accounting principles.  Accordingly, by including the undocumented and unsupported revenue in the quarterly financial results announced in the fourth quarter press release, Mikailli and Pado knowingly made false and misleading statements regarding the revenue of Unify.

**D.  Mikailli and Pado Made False Statements To Unify's Independent Auditors**

78.     On August 13, 1999, Mikailli and Pado signed a letter addressed to Unify's independent auditors, Deloitte & Touche LLP, in which they falsely represented that the financial information for the quarter ended July 31, 1999, that had been provided by Unify to the independent auditors for review was fairly presented in conformity with generally accepted accounting principles.  Mikailli and Pado also falsely represented to the independent auditors that they had made available to the auditors all applicable contractual information regarding revenue recognition.  Mikailli and Pado further falsely represented to the independent auditors that they had not entered into any informal side agreements, including modifications, or verbal arrangements related to the contractual information they had provided.  As Mikailli and Pado well knew, Unify had entered into a number of

1  contingent sales and reciprocal transactions, had improperly recognized revenues from those

2  transactions, and had concealed the true nature of those transactions from its independent auditors.

3         79.    On November 12, 1999, Mikailli and Pado signed a letter addressed to Unify's

4  independent auditors, Deloitte & Touche LLP, in which they falsely represented that the financial

5  information for the quarter ended October 31, 1999, that had been provided by Unify to the

6  independent auditors for review was fairly presented in conformity with generally accepted

7  accounting principles.  Mikailli and Pado also falsely represented to the independent auditors that

8  they had made available to the auditors all applicable contractual information regarding revenue

9  recognition.  Mikailli and Pado further falsely represented to the independent auditors that they had

10  not entered into any informal side agreements, including modifications, or verbal arrangements

11  related to the contractual information they had provided.  As Mikailli and Pado well knew, Unify had

12  entered into a number of contingent sales and reciprocal transactions, had improperly recognized

13  revenues from those transactions, and had concealed the true nature of those transactions from its

14  independent auditors.

15         80.    On March 13, 2000, Mikailli and Pado signed a letter addressed to Unify's

16  independent auditors, Deloitte & Touche LLP, in which they falsely represented that the financial

17  information for the quarter ended January 31, 2000, that had been provided by Unify to the

18  independent auditors for review was fairly presented in conformity with generally accepted

19  accounting principles.  Mikailli and Pado also falsely represented to the independent auditors that

20  they had made available to the auditors all applicable contractual information regarding revenue

21  recognition.  Mikailli and Pado further falsely represented to the independent auditors that they had

22  not entered into any informal side agreements, including modifications, or verbal arrangements

23  related to the contractual information they had provided.  As Mikailli and Pado well knew, Unify had

24  entered into a number of contingent sales and reciprocal transactions, had improperly recognized

25  revenues from those transactions, and had concealed the true nature of those transactions from its

26  independent auditors.

27         81.    On March 13, 2000, Mikailli and Pado signed a letter addressed to Unify's

28  independent auditors, Deloitte & Touche LLP, in which they falsely represented that the Company's

1 unaudited financial statements and schedules on Form 10-Q for the prior three quarters that had been

2 incorporated by reference in the Company's registration statement on Form S-3 were fairly

3 presented.  Mikailli and Pado also falsely represented to the independent auditors that no events had

4 occurred subsequent to April 30, 1999 that had a material effect on the financial statements.  Mikailli

5 and Pado further falsely represented to the independent auditors that no matters had come to their

6 attention that would cause them to believe that the representations made by them on August 13, 1999

7 and November 12, 1999 were no longer true.

8 **E.    Mikailli's Insider Trading And Ill-Gotten Gains.**

9        82.    Mikailli profited from the fraud by engaging in illegal insider trading of Unify

10 stock, and receiving sales commissions and bonuses.

11       83.    From September 1999 through June 2000, during the course of the fraud, and

12 while in possession of material non-public information concerning Unify, Mikailli sold all of his

13 shares of Unify stock.  Mikailli received gross proceeds from these sales of approximately $8.2

14 million.  During all of Unify's fiscal year 2000, from May 1, 1999 through April 30, 2000, Mikailli

15 knew that Unify was reporting fraudulent revenue and was communicating false expectations of

16 revenue to market analysts and investors.  Despite being reminded on a monthly basis to do so and

17 despite the fact that he had done so in prior years, Mikailli failed to file forms with the Commission

18 reporting his sales of Unify stock.

19       84.    Mikailli also received $400,000 in sales commissions for his role in

20 negotiating transactions with customers, including Ichatterbox, Arsin, and Arango.  Mikailli's

21 compensation agreement did not allow for him to be paid sales commissions.  Mikailli also received a

22 bonus totaling $300,000 for fiscal year 2000.  However, his compensation agreement limited his

23 bonus to $150,000.

24                    **FIRST CLAIM FOR RELIEF**

25             *Violations of Section 10(b) of the Exchange Act*
26             *and Rule 10b-5 by Mikailli and Pado.*

27       85.    The Commission realleges and incorporates by reference Paragraphs 1 through

28 84 above.

COMPLAINT                                23
SEC v. Mikailli, et al.

86.     During the relevant period, Mikailli and Pado, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or of the mails, with scienter:

(a)     employed devices, schemes, or artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

(c)     engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

87.     Mikailli and Pado, have violated and, unless restrained and enjoined, will continue to violate Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5.

## SECOND CLAIM FOR RELIEF

*Violations of Section 13(a) of the
Exchange Act and Rules 12b-20 and 13a-13 by Unify.*

88.     The Commission realleges and incorporates by reference Paragraphs 1 through 84 above.

89.     As described above, by filing with the Commission materially misleading financial statements in its periodic reports for the quarters ended July 31, 1999, October 31, 1999, and January 31, 1999, Unify violated Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-13 thereunder.

90.     Unify has violated and, unless restrained and enjoined, will continue to violate Section 13(a) of the Exchange Act, 15 U.S.C. 78m(a), and Rules 12b-20, 17 C.F.R. §240.12b-20, and 13a-13, 17 C.F.R. §240.13a-13.

**THIRD CLAIM FOR RELIEF**

*Aiding and Abetting Violations of Section 13(a) of the*
*Exchange Act and Rules 12b-20 and 13a-13 by Mikailli and Pado.*

91.     The Commission realleges and incorporates by reference Paragraphs 1 through 84 above.

92.     Unify violated Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-13 thereunder.

93.     By engaging in the conduct described above, Mikailli and Pado knowingly provided Unify substantial assistance with respect to its violations of Sections 13(a) of the Exchange Act and Rules 12b-20 and 13a-13 thereunder, and therefore are liable as aiders and abettors pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. §78t(e).

94.     Mikailli and Pado have violated and, unless restrained and enjoined, will continue to violate Section 13(a) of the Exchange Act, 15 U.S.C. 78m(a), and Rules 12b-20, 17 C.F.R. §240.12b-20, and 13a-13, 17 C.F.R. §240.13a-13.

**FOURTH CLAIM FOR RELIEF**

*Violations of Section 13(b)(2)(A)*
*of the Exchange Act By Unify.*

95.     The Commission realleges and incorporates by reference Paragraphs 1 through 84 above.

96.     As described above, by failing to make and keep books and records that accurately reflected the disposition of its assets during fiscal year 2000, Unify violated Section 13(b)(2)(A) of the Exchange Act.

97.     Unify has violated, and, unless restrained and enjoined, will continue to violate Section 13(b)(2)(A) of the Exchange Act, 15 U.S.C. §78m(b)(2)(A).

**FIFTH CLAIM FOR RELIEF**

*Aiding and Abetting Violations of Section 13(b)(2)(A)*
*of the Exchange Act By Mikailli and Pado.*

98.     The Commission realleges and incorporates by reference Paragraphs 1 through 84 above.

99.     Unify violated Section 13(b)(2)(A) of the Exchange Act.

100.     By engaging in the conduct described above, Mikailli and Pado knowingly provided Unify substantial assistance with respect to its violation of Sections 13(b)(2)(A) of the Exchange Act, and therefore are liable as aiders and abettors pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. §78t(e).

101.     Mikailli and Pado have violated and, unless restrained and enjoined, will continue to violate Section 13(b)(2)(A) of the Exchange Act, 15 U.S.C. §78m(b)(2)(A).

## SIXTH CLAIM FOR RELIEF

*Violations of Section 16(a) of the Exchange Act and Rule 16a-3 by Mikailli*

102.     The Commission realleges and incorporates by reference Paragraphs 1 through 84 above.

103.      As described above, by failing to file statements with the Commission regarding his change in ownership of Unify shares during fiscal year 2000, Mikailli knowingly violated Section 16(a) of the Exchange Act.

104.     Mikailli has violated and, unless restrained and enjoined, will continue to violate Section 16(a) and Rule 16a-3of the Exchange Act.

## SEVENTH CLAIM FOR RELIEF

*Violations of Rule 13b2-2 by Mikailli and Pado*

105.     The Commission realleges and incorporates by reference Paragraphs 1 through 84 above.

106.     By engaging in the conduct described above, and in connection with an audit or examination of the financial statements of Unify and the preparation and filing of statements and reports with the Commission, Mikailli and Pado, directly or indirectly, made or caused to be made materially false or misleading statements to accountants and omitted to state, or caused another person to omit to state to accountants material facts necessary in order to make statements made to the accountants, in light of the circumstances under which such statements were made, not misleading.

1       107.    Mikailli and Pado have violated and, unless restrained and enjoined, will

2  continue to violate Rule 13b2-2, 17 C.F.R. § 240.13b2-2.

3

4                     **<u>PRAYER FOR RELIEF</u>**

5      WHEREFORE, the Commission respectfully requests that this Court:

6                          I.

7      Permanently enjoin defendants Mikailli and Pado from violating Sections 10(b), 13(a),

8  and 13(b)(2)(A) of the Exchange Act and Rules 10b-5, 12b-20, 13a-13, 13b2-1 and 13b2-2.

9                        II.

10      Permanently enjoin defendant Mikailli from violating Section 16(a) and Rule 16a-3.

11

12

13                      III.

14      Permanently enjoin defendants Mikailli and Pado from serving as an officer or

15  director of any entity having a class of securities registered with the Commission pursuant to Section

16  12 of the Exchange Act [15 U.S.C. §78l] or that is required to file reports pursuant to Section 15(d)

17  of the Exchange Act [15 U.S.C. §78o(d)].

18                      IV.

19      Order defendant Mikailli to disgorge any wrongfully obtained benefits, including

20  prejudgment interest.

21                      V.

22      Order defendants Mikailli to pay civil penalties under Sections 21(d)(3) and 21A of

23  the Exchange Act [15 U.S.C. § 78u(d)(3) and 78u-1] and Pado to pay civil penalties under Section

24  21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

25                      VI.

26      Permanently enjoin defendant Unify from violating Sections 13(a), and 13(b)(2)(A) of

27  the Exchange Act and Rules 12b-20, and 13a-13.

28

## VII.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VII.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated: May 20, 2002

Respectfully submitted,

_____
Patrick Thomas Murphy
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION